# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**TERESA ANN NICHOLS,**
      **Plaintiff,**

**v.**                              **Case No. 3:11cv409/LC/CJK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
      **Defendant.**

_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381-83.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, should be affirmed, and the application for supplemental security income denied.

## PROCEDURAL HISTORY

On June 5, 2007, Teresa Ann Nichols (who will be referred to by name, as

plaintiff, or as claimant) protectively filed an application for supplemental security income, alleging disability beginning May 15, 2007.[1]   T. 152-58, 232.[2]   The application was denied initially and upon reconsideration.   T. 12, 88-95, 99-107 Claimant filed a written request for a hearing, which was held before an Administrative Law Judge ("ALJ") on June 12, 2009, with a supplemental hearing on October 30, 2009.   T.12-19, 26-40, 42-61.   In a decision dated November 16, 2009, the ALJ denied claimant's application for supplemental security income, finding she had not been under a disability within the meaning of the Social Security Act at any time from the alleged onset date through the date of the decision.   The Appeals Council of the Social Security Administration denied plaintiff's request for review on November 16, 2009, rendering the ALJ's decision the final decision of the Commissioner.   T. 1-6.   In the present action for review of the Commissioner's decision, Ms. Nichols raises one issue, asserting the ALJ failed to adequately consider "significant probative evidence" in reaching his conclusion.   (Doc. 6, p. 5).   Despite the phrasing of this issue, plaintiff addresses only evidence of mental impairment,[3] contending that "the ALJ failed to discuss or consider [Global Assessment of Functioning ("GAF")] scores below 50."   (Doc. 6, pp. 3-4, 5-6).

FINDINGS OF THE ALJ

---

[1]Claimant initially filed in January 2006, alleging disability beginning December 17, 2005. This application was denied. In June 2007, a disability field reporter recommended she amend her disability onset date to May 2007.  T. 85, 145-51, 232.

[2] The administrative record, as filed by the Commissioner, consists of 7 volumes (doc. 4-3 through 4-9) and has 575 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

[3]Claimant has a variety of physical impairments.   The ALJ's consideration of such impairments, in isolation or in conjunction with mental impairments, is not presented as an issue on appeal.  The factual background and analysis reflect the issue as presented.

In the written decision, the ALJ made a number of findings relative to the issue raised on appeal:

1. The claimant has not engaged in substantial gainful activity since May 15, 2007, the application date.

2. The claimant has the following severe impairments: chronic low back pain, chronic neck pain, mild lumbar spondylosis, moderate cervical spondylosis, and status post healed left distal fibula and proximal fibula fractures. The ALJ also considered evidence of mental impairments, but found such impairments non-severe:

> The claimant's medically determinable mental impairments of polysubstance abuse, depressive disorder, bipolar disorder and personality disorder, considered singly and in combination do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

> In making this finding, the undersigned considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

T. 14.

In the first and second functional areas, daily activity and social functioning, the ALJ determined that claimant has mild limitation. The ALJ based his decision on claimant's abilities to live with a friend, watch television, read books, and talk on the phone with friends daily. The ALJ also noted claimant cared for pet cats, handled her own personal hygiene, cooked, and managed household chores. Claimant also left her home frequently and shopped for her needs. In reaching a conclusion as to plaintiff's limitation in the first two functional areas, the ALJ gave "great weight" to

the opinions of three State agency psychological consultants.

Next, the ALJ assessed claimant's limitation in the third and fourth functional areas, concentration, persistence, or pace, and episodes of decompensation:

> The claimant does not need reminders to take care of her personal needs or to take her medications. The claimant states she can follow written and oral instructions "well enough." (Exhibit 17E). The claimant spends much of her time watching television and reading books. During her consultative examination, the claimant was able to recall three items after a delay. "She was able to give answers with details to all the questions asked about her past. There was no immediate evidence of memory deficits." Two different State agency psychological consultants opined the claimant has mild limitation in this broad functional area. (Exhibits 7F, and 18F). These opinions were developed after review of the claimant's medical records. These opinions are consistent with each other. These opinions are consistent with the claimant's activities of daily living. The undersigned gives great weight to these opinions. A third State agency psychological consultant opined in his narrative that it "appears that the claimant's functioning [in this area] is mildly/moderately impacted." (Exhibit 24F and 13). The undersigned gives moderate weight to this opinion because it is inconsistent with the other two State agency opinions and is not as consistent with the medical evidence of record.
>
> The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.
>
> Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere.

T. 15.

    3.  The claimant does not have an impairment or combination of impairments

that meets or medically equals one of the listed impairments in 20 C.F.R.  Part 404, Subpart P, Appendix 1.

4.  The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except the claimant is limited to work which will allow her to stand and make postural adjustments at least once every hour.  The claimant is further limited to work which will only require her to stand/walk for one hour during an eight hour workday (but never more than thirty minutes consecutively).  The claimant is limited to work which will only require her to: frequently climb (stairs and ramps), balance, stoop, kneel or crouch; and occasionally climb (ladders or scaffolds) or crawl.

5.  The claimant has no past relevant work.

6.  The claimant was born on July 10, 1969, and was thirty-seven years old, which is defined as a younger individual age eighteen to forty-four, on the date the application was filed.

7.  The claimant has at least a high school education and is able to communicate in English.

8.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

9.  The claimant has not been under a disability, as defined in the Social Security Act, since May 15, 2007, the date the application was filed.

<u>STANDARD OF REVIEW</u>

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence, and whether the correct legal standards were applied by the ALJ.  *See Lewis v. Callahan*, 125 F.3d

1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan,* 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at1439).  Although, the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).  The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record."[4] *Flynn v. Heckler*, 768 F.2d. 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea*

---

[4]The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

*v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).  The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2.  If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity, and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.  Even if the claimant's impairments prevent her from performing her past

relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Where relevant, a claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512(a). The Eleventh Circuit has explained the operation of step five:

> In practice, the burden temporarily shifts at step five to the Commissioner. *See Jones*, 190 F.3d at 1228. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. *See id.* In order to be considered disabled, the claimant must then prove that [she] is unable to perform the jobs that the Commissioner lists. *See id.* The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)("The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act")).

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

## FACT BACKGROUND AND MEDICAL HISTORY[5]

Plaintiff was born on July 10, 1969, making her thirty-seven years old on the alleged onset date. T. 45. She completed ninth grade before dropping out of school, earned a GED in 1984, and later attended cosmetology school. T. 30, 46-47. Ms. Nichols lives in Pensacola, Florida, with her boyfriend R. P. Connolly, Jr. T. 189, 196, 202, 363. In June 2002, claimant lost parental rights as a result of substance

---

[5]Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

abuse problems.[6]  T. 337-38.   A friend adopted her two children; she has no contact with them.  T. 338.

 She reported working as a hair dresser from 1989 to 1998.  T. 173.  Between 1998 and 2006, she held positions as a grill cook, cashier, and housekeeper (residential and commercial).  T. 225, 238, 291, 334.  She could do the jobs, but quit due to physical and emotional stress.  T. 51.  Claimant last worked in 2006, as a housekeeper for Luxury Suites.  T. 48-49.  She quit this job after eight months, because her "body just couldn't handle [the physical stress]."  T. 49.

Periodically over the past ten years, different psychological professionals assessed claimant's Global Assessment Functioning ("GAF") score.  Her GAF ranged from a forty-five to a fifty-eight within a span of seven years.  The chronology of relevant medical history begins in October 2002, when Dr. Lawrence Gilgun conducted a psychological assessment.  T. 298, 304.  Approximately three months prior, the Department of Children and Families removed her children from her custody.  T. 298.  She was also admitted into inpatient treatment due to an alleged overdose around that time.  T. 298.  Additionally, Ms. Nichols's father was dying of cancer, and her "common law" husband had recently died from an overdose.  T. 300.  Despite these issues, claimant scored a GAF of fifty-five.  T. 298, 304.

On January 13, 2006, claimant sought treatment at the Lakeview Center, a mental health facility.  T. 333.  George Gourley[7] evaluated claimant, noting her mood

_____

[6]Claimant has a history of substance abuse.  Beginning as a teenager, she has used or abused alcohol, marijuana, cocaine, and prescription pain pills.  T. 55, 298, 300, 361, 379, 396, 504.

[7] George Gourley, a member of the Lakeview staff screened claimant before she could receive treatment at Lakeview.  He is likely a social worker, because there is no indication that he is a doctor or nurse.

was depressed, but also that she indicated she was not currently taking any medications.  T. 333, 335.  Furthermore, claimant admitted that up until one month before she used marijuana and cocaine.  T. 333-34.  He diagnosed claimant with bipolar disorder, cocaine dependence, alcohol dependence, and mood disorder.  T. 334.  At this initial assessment, her GAF was a forty-five.  T. 334.  Kay McWhirter, a nurse practitioner at the Lakeview Center, treated and assessed Ms. Nichols at a subsequent appointment, on January 26, 2006.  T. 339.  McWhirter ruled out bipolar affective disorder, diagnosed claimant as suffering from polysubstance dependency and prescribed medication for mood stabilization.  T. 338.  Her GAF was a fifty-three, and when asked claimant denied any major problems.  T. 338.

Claimant continued treatment with Nurse McWhirter, seeing her three more times in 2006.  Her next appointment was in May, when McWhirter assessed claimant with a GAF of fifty-four.  T. 359-60.  The nurse diagnosed polysubstance dependency again, yet noted claimant's alcohol, cocaine, and cannabis dependency were in reported remission.  T. 359.  Also, McWhirter added a diagnosis of bipolar disorder.  T. 359.  In July, at her next appointment, claimant's diagnosis shifted, indicating she recently used crack cocaine.  T. 361.  Claimant expressed concern that she would be kicked out of a Work Release program, and have to serve her sentence in jail, she was in trouble because of this substance use and once staying out all night.[8]  T. 361.  Despite her recent drug slip and incarceration (via the Work Release program), claimant was responding to medication, McWhirter prescribed additional medication for depression, and noted the GAF was a fifty-six.  T. 361-62.  At claimant's last

---

[8]Claimant was put into the Work Release program because she violated probation in May 2005.  T. 361.

appointment with McWhirter that year, the GAF was fifty-eight.  T. 363.  Claimant reported noticing a difference on medication, and McWhirter assessed polysubstance abuse in early remission.  T. 266, 363.  This appointment was the last before claimant was discharged from the Lakeview Center.[9]  T. 451-52.

In August 2007, Dr. Lynn Lightfoot, Ph.D., evaluated claimant for the Division of Disability Determination.  T. 429.  Discovering claimant was not keeping up with appointments at the Lakeview Center, Dr. Lightfoot learned claimant no longer had medication prescribed by them.  T. 429.  Dr. Lightfoot noted claimant had "a history of increasingly life threatening experiences that seem[ed] to be brought on by her own self-neglect and poor choices," and diagnosed claimant with polysubstance abuse, depressive disorder, and personality disorder.[10]  T. 431.  He assessed claimant with a GAF of fifty, her lowest since beginning treatment at Lakeview.  T. 429.  Months before this assessment, claimant was involved in a car accident and a victim of an assault.  T. 375.  As a result, two doctors found her incapable of working for several months due to injuries she sustained in her left leg.  T. 389, 397.

Claimant's next psychological assessment occurred in May 2009.  That April, when riding her bicycle home from a friend's, someone assaulted claimant, beating

---

[9]The Lakeview Center discharged claimant in September 2007, due to non-compliance. T. 451-52. The discharge report listed both conditions from intake (including her early 2006 GAF score of forty-five), and discharging conditions indicating a current GAF score of fifty-eight. T. 452. At discharge, claimant's diagnosis was that she was suffering from mood disorder, alcohol dependence, bipolar disorder, and cocaine dependence.  T. 451.

[10]Days following Dr. Lightfoot's assessment, Dr. Suzanne Zoss, Ph.D., conducted a psychiatric review of claimant.  Dr. Zoss found only mild limitation in claimant's daily activity, social functioning, and concentration, persistence, or pace.  Additionally, Dr. Zoss noted claimant has no history of decompensation.  T. 433-46.

and possibly raping her.  T. 513-14.  One month later, in May, she again sought treatment at Lakeview to help cope with this recent trauma.  T. 572.  A member of the Lakeview staff diagnosed claimant with bipolar disorder, and noted claimant had "financial, legal, employment, relationship, and physical health problems because of substance abuse."  T. 525.  Claimant admitted to using alcohol up until one month prior, but not using marijuana for a year.  T. 524-25.  Her GAF was a fifty-five.  T. 525.

In August 2009, Kay McWhirter again treated claimant at the Lakeview Center. T. 575.  At this session, claimant indicated she had been off her medications for two years, was still drinking alcohol (last used one week before), was still using cannabis (yet had reduced to "one joint every couple of weeks"), and was sporadically using crack cocaine (last used three months prior, approximately May 2009).  T. 572-73. Claimant told McWhirter that she had applied for disability benefits for her chronic pain issues; she did not indicate that she had also filed for issues relating to mental health.  T. 574.  Finally, McWhirter noted claimant's "cognitive abilities [were] grossly intact, and insight and judgment [were] fair."  T. 574.  McWhirter diagnosed claimant with "bipolar disorder not otherwise specified, alcohol, cocaine, and cannabis dependency, with sporadic use, personality disorder not otherwise specified, problems with primary support, occupational, financial; recent assault," and GAF of fifty-five.  T. 574.

Ms. Nichols's most recent assessment occurred in September 2009.  T. 571. McWhirter diagnosed claimant with polysubstance dependence in reported remission. T. 571.  The nurse made no notation that claimant had support, occupation, or financial issues.  Noting claimant was clean, neat, cooperative, spontaneous in

interactions, goal directed, getting better sleep, less irritable and denied depression, McWhirter found claimant to be at ninety-five percent overall improvement.  T. 571. Coincidentally, claimant was then helping a friend who was recently injured in a motorcycle accident, and had lost another friend in a motorcycle accident within that month.  T. 571.  At that time, claimant scored a GAF of fifty-eight.  T. 571.

Beginning in 2004, Dr. George Smith, M.D., treated claimant at the Escambia Community Clinic ("ECC").  T. 309.  Initially, Dr. Smith diagnosed depression, anxiety, and degenerative joint disease (neck pain), and prescribed medication for only depression and neck pain.  T. 309-10.  With visits spaced approximately every three months, claimant continued to see Dr. Smith, and rarely another doctor at the ECC for refills.  T.  261, 305-32, 398-427, 447-50, 527-47, 560-69.

Later in 2004, Dr. Smith diagnosed "bipolar affective disorder, manic, mild degree," and prescribed Zyprexa for this condition.  T. 313.  The only change claimant mentioned was an additional complaint of arrhythmia.  T. 311.  Claimant returned approximately six months later, and reported that medication improved her symptoms.  T. 314.  Despite claimant's reported improvements, and without noting reasoning, Dr. Smith prescribed additional medication to treat anxiety.  T. 315.

Dr. Smith routinely noted claimant's mental status was "alert," and her general appearance was "cooperative, no acute distress," among other positive assessments. T. 309, 311, 314, 316, 320, 322, 324, 325, 403, 406, 409, 412, 416, 419, 422, 425, 448, 531, 537, 545, 546, 563, 568.  From 2004 to 2009, plaintiff's treatment notes were relatively consistent with two exceptions.  T. 541-42, 528.  Dr. Mike Busby treated claimant in June 2008, at a standing appointment for medication refills.  T. 541.  He noted claimant's general appearance was "cooperative, not anxious,

depressed, in acute distress, and lethargic/slow, restless or sickly." T. 542. Despite this different nomenclature, Dr. Busby refilled her routine medications. T. 541. In March 2009, Dr. Smith who previously noted claimant's general appearance as "cooperative, no acute distress," like Dr. Busby noted claimant's general appearance to be "cooperative, not anxious, depressed, in acute distress, and lethargic/slow, restless or sickly." T. 528. This variation is not reflected in his diagnosis or medication. T. 528.

Different State psychological consultants assessed claimant, one in March 2006, another in August 2007, and a third in December 2007. Each indicated claimant's impairments were not severe. T. 344-56, 433-45, 459-71. Although in the December 2007 assessment, examiner, Dr. Robert Schilling, Ph.D., P.C., recorded not mild but moderate difficulty in maintaining concentration, persistence or pace. T. 469. He concluded this assessment was based on claimant's statements, despite her ability to learn and recall three items after only one attempt, give detailed answers, and her lack of immediate evidence of memory loss. T. 471. Furthermore, Dr. Schilling noted that substance abuse issues and claimant's non-compliance with treatment were exacerbating the symptoms reported. T. 471.

## HEARING BEFORE THE ALJ

Claimant attended both ALJ hearings with her lawyer, Nick Ortiz. Sheila Justice, a vocational expert, was also present. T. 26, 41. The initial administrative hearing commenced on June 12, 2009, with the testimony of Ms. Nichols. T. 43-47. Claimant testified the longest she held a job was between six and seven months. T. 50. Plaintiff was never fired from a job, but always quit after a brief period of time due to physical stress, with the exception of cashiering, which she indicated also

caused anxiety.  T. 48-51.  The ALJ remarked on Ms. Nichols's history of injuries. Claimant agreed with the ALJ that she has "some history for being hurt," then added that she "made some really... bad mistakes in the past," and excused her mistakes and substance abuse as a result of bad judgment associated with bipolar disorder.  T. 53. The ALJ then specifically questioned plaintiff on her history of substance abuse, "risky behavior," and drugs, both recreational and street, she used to self medicate. She replied that she used both prescription pain pills and cocaine to cope.  T. 55.  She testified she abstained the longest during pregnancy, and was clean for about two months prior to the hearing.  T. 54-56.  Claimant agreed that substances inhibited her ability to work, and added that she was just physically unable to work despite wanting to do so.  T. 57.

At the supplemental hearing, in October 2009, the ALJ discussed claimant's GAF.  T. 35.  The ALJ noted the most recent GAF was a fifty-eight, and considered it to be a fair score, because claimant reported the use of all substances to be in remission at the time of assessment.  T. 35.  The ALJ asked the vocational expert to assess claimant's ability to find substantial gainful activity based on the GAF of fifty-eight and claimant's limitations of sedentary, one to two-step, unskilled work.  T. 35. Ms. Justice determined claimant could perform substantial gainful activity.  T. 36. Identifying optical goods assembler, circuit board assembler, and bond semiconductor as examples of jobs which would accommodate claimant's limitations, Ms. Justice determined claimant "would be limited to sedentary work with positional changes available that [w]as unskilled at lower levels."  T. 36-37.

On cross-examination, Mr. Ortiz asked Ms. Justice to consider his own hypothetical and determine if an individual matching this description could maintain

substantial gainful activity:

> Consider a hypothetical individual with the same age, education, and work history as the claimant.  And... to further consider any restrictions contained in... a psych evaluation by Dr. Lynn Lightfoot.[11]  [T]hat would include... an indication of an individual that is limited in intelligence, has a current – a then current [GAF] score of 50.  And the conclusion's the individual has a history of increasingly life-threatening experiences that seem to be brought on by the individual's own self-neglect and poor choices.  Again, average intelligence.  Individual presents as naive and inept to live life as an adult.  Individual would require ongoing psychiatric interventions in order to avoid more adverse circumstances with the... prognosis.  So with a [GAF] score of 50, consider that to indicate serious symptoms such as suicidal ideations, severe obsessional rituals or frequent shoplifting, or any serious impairment of social, occupations, or school functioning.

T. 38.  In considering this hypothetical person, Ms. Justice replied, "the only limitation I can respond to in terms of her– the person's ability to work is the GAF of [fifty].... A GAF of [fifty] would not allow an individual to perform the jobs I [have] identified or any other work."  T. 39.

## ANALYSIS

Claimant raises one issue in this appeal, arguing that "[t]he ALJ's failure to address 'significant probative evidence' is reversible error."  (Doc. 6, p. 7).  Plaintiff identifies three GAF scores at or below fifty:

- GAF [fifty] [i]n Division of Disability Determination Psychological Evaluation, dated August 16, 2007, by Dr. Lynn Lightfoot, Ph.D.  T. 429-31.

- GAF [forty-five] Lakeview records [initial assessment], dated January, 13, 2006.  T. 333-35.

---

[11]Dr. Lightfoot conducted his evaluation of claimant on August 16, 2007.  T. 429-31.

· GAF [forty-five] Lakeview records [discharge summary], dated September 26, 2007.[12]  T. 451-52.

(Doc. 6, pp. 3-4).  Based on the ALJ's alleged failure to consider the aforementioned GAF scores, each at or below fifty, plaintiff seeks reversal and remand for further consideration.  (Doc. 6, p. 6).

Global Assessment of Functioning Scale, or "GAF," is primarily used by mental health practitioners.  The scale provides medical professionals a way to give an opinion numerically, "rat[ing] the occupational, psychological and social functioning of adults."[13]  *See Smith v. Comm'r of Soc. Sec.*, No. 6:10-cv-1478-Orl-31KRS, 2011 WL 6217110, at *4 n.1 (M.D. Fla. Nov. 1, 2011).  A GAF score between forty-one and fifty indicates severe impairments.  *See McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006).  A score between fifty-one and sixty

_____

[12]Plaintiff misstates in her memorandum that this is a second score of forty-five.  The record reveals a score of forty-five on the Lakeview Center's discharge summary, dated September 26, 2007.  The forty-five is her GAF score from the initial assessment discussed above, and is not a second separate score.  In fact, the discharge summary also includes her discharge GAF of fifty-eight. T. 451-52.

[13] As explained by an Oklahoma District Court:

A GAF represents Axis V of the Multiaxial Assessment system.  A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM–IV), (4th ed.1994), p. 30.  The GAF score is taken from the GAF scale which "is to be rated with respect only to psychological, social, and occupational functioning."  *Id.*  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 32.  The GAF scale defines the range from 41 to 50 as follows:  Serious symptoms OR serious impairment in one of the following:  social, occupational, or school functioning.

*Sanders v. Astrue*, No. CIV–10–616–L, 2011 WL 3207367, at *3 n.1 (W.D. Okla. June 30, 2011).

indicates moderate difficulties or symptoms in social, occupational, or school functioning. *See Wind v. Barnhart,* 133 F. App'x 684, 687 n.1 (11th Cir. 2005) (*citing* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000-TR)). Vocational experts have found an individual with a score of fifty or lower is unable to maintain substantial gainful activity. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (finding a GAF score of fifty reflects a serious limitation on a claimant's ability to perform basic life tasks); *Mook v. Barnhart*, No. 02-2347, 2004 WL 955327, at *6 (D. Kan. April 26, 2004) (noting vocational expert's testimony that claimant's GAF score of fifty would eliminate any possible jobs in the national economy).

The Social Security Administration has not endorsed the GAF scale for use in the SSI disability program. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (noting that GAF score may assist ALJ in formulating residual functional capacity, but is "not essential to the RFC's accuracy"). GAF scores are not a direct indication of an individual's disability status, but rather are only recognized as a tool to assist the ALJ in forming a decision. *See Wind v. Barnhart*, 133 F. App'x 684, 691-92 n.5 (11th Cir. 2005). A low GAF score does not dictate a finding of disability, without evidence indicating impairment associated with maintaining gainful activity.[14] *See Bracciodieta-Nelson v. Comm'r of Soc. Sec.*, 782. F. Supp. 2d

---

[14]A GAF score is not dispositive of ability to work:

> [A] GAF score alone, without a sufficient accompanying interpretative and explanatory narrative, may admit of several different interpretations.... [A] particular GAF score alone may not constitute a clear statement of medical opinion directed specifically at the relevant capacity of the claimant (such as residual capacity to perform basic work functions).

*Ackermann-Papp v. Comm'r of Soc. Sec.*, No. 1:06-cv-832, 2008 WL 314682, at *3 (W.D. Mich.

152, 165 (W.D. Pa. 2011) ("[While] GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability."). Even where the ALJ neglects to mention low GAF scores or assigns little weight to them, if the mental capacity findings are supported by substantial evidence the decision will be affirmed. *See Edwards v. Barnhart*, 383 F. Supp. 2d 920, 929 (E.D. Mich. 2005) (affirming where ALJ relied on claimant's abilities and improvements indicated by mental health professionals in making disability finding despite failure to mention GAF score of fifty to fifty-five assessed by treating psychiatrist).

Here, claimant's low scores correlate with her stress, use of alcohol or drugs, and lack of prescription medical treatment at the times of assessment. In January 2006, when the Lakeview staff assessed Ms. Nichols with a GAF of forty-five, she had recently filed for disability, was beginning to seek treatment at Lakeview, and was in a car accident just one month before.[15]  T. 31, 140-44, 333-35.  She was using cocaine and drinking alcohol up to one month before, and was not on any medication at the time. T. 333-34.  At this assessment, the Lakeview personnel found her mood depressed and recommended counseling and substance abuse treatment.  T. 334.

In August 2007, Dr. Lightfoot assessed plaintiff with a GAF of fifty, one of the two GAF scores plaintiff argues the ALJ failed to discuss. T. 429, 431. Eight months before, however, claimant was assaulted and injured in another car accident. T. 429-31.  Due to her resulting physical limitations, two doctors instructed claimant not

2008).

[15]The record contains no evidence of medical treatment following this accident.

work for a period of several months.  T. 389, 397, 429-30.  Additionally, plaintiff was not keeping up with Lakeview Center appointments and no longer had any medication they prescribed.   Dr. Lightfoot noted plaintiff "had a history of increasingly life threatening experiences that seem[ed] to be brought on by her own self-negligence and poor choices," and that she was "naïve and inept to live life as an adult."  Despite that observation, the doctor also found plaintiff was clean, had good eye contact, a clear voice and no evidence of mental deficits.  T. 430-31.

In a psychiatric review conducted on August 22, 2007, Dr. Zoss found claimant had mild limitation in activities of daily living (mostly physical limitations), mild limitations in social functioning, and mild limitations in persistence, concentration, and pace.  T. 433-46.  Dr. Zoss indicated that despite reported difficulty, claimant demonstrated a fair fund of information, provided a detailed personal history, was able to recall three items after delay, could perform calculations fairly,[16] and had average intellect.  T. 443, 445.  Other than the two aforementioned assessments, claimant's GAF never fell below a fifty-three within the span of seven years.

Despite the ALJ's failure to discuss either Dr. Lightfoot's or Dr. Zoss's findings within his decision, the medical records of these providers still support the ALJ's finding that claimant's mental impairments are non-severe.  In reaching this determination, the ALJ utilized the entire medical record concerning claimant's mental functioning.  T. 15, 17-19.  He discussed the findings of the three State psychological consultants, the weight he accorded to each, as well as claimant's and her third party's statements regarding her abilities in each functional area.  T. 15-16.

---

[16]Dr. Zoss also noted that Dr. Lightfoot found claimant was able to manage her own funds. T. 445.

Despite the ALJ's failure to discuss claimant's lower GAF scores,[17] these two scores are not consistent with claimant's mental history as a whole, including her other GAF scores and treatment notes of record. Furthermore, none of the evaluating or treating providers indicated claimant has or had severe mental impairment, or that she would be unable to maintain substantial gainful activity due to her mental functioning. Therefore, no error is apparent in the mere omission of the GAF scores.

Based upon the foregoing analysis, the ALJ adhered to applicable legal standards to produce a decision supported by substantial evidence. *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). It is therefore respectfully RECOMMENDED:

The application for supplemental security income be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida this 7th day of August, 2012.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

_____

[17] The ALJ did not include any GAF scores (low or high) within his decision. At the hearing, however, the ALJ instructed the vocational expert to consider claimant's most recent GAF score, and noted that claimant's score was above fifty when she was in remission and following prescribed medical treatment. T. 35.

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).